May it please the court, Chief Justice, Justices, and counsel for the appellee, my name is Garlis Shuman and I represent the appellate Joe Leonard Rodriguez. This is a direct appeal from the District of North Dakota after jury convicted Mr. Rodriguez of seven charges, five counts of distribution of controlled substance, one count of possession with intent to distribute a controlled substance, and one count conspiracy to possess with intent to distribute and distribute controlled substances. The standard of review in this case is de novo. In other words, the only deficiency of the evidence would cause a reversal if no reasonable jury could have found this defendant should have been found guilty. We're asking the court today to reverse Mr. Rodriguez conviction on count one for the indictment, which is the conspiracy conviction, distribute methamphetamine, and also we're asking the court to grant a new trial on Mr. Rodriguez's counts two through seven of the indictment. Justices, we find that there was insufficient evidence to convict Mr. the appellate of a conspiracy, as was the charge in one count of one of the indictment. Count one said he did intentionally knowing intentionally conspire confederate agree with others known and unknown to the grand jury. Counsel, can I ask a question that I wasn't sure of from your brief? Ms. Burns, of course, testified to a great deal of conduct before the indictment alleged the conspiracy began. Are you arguing that that evidence, because it's outside the scope of the conspiracy as charged, cannot be considered as evidence of sufficiency? Your Honor, we are saying that the sufficiency of the evidence in terms of when the indictment was when they alleged it started, which was July 1st until July, June 20th, 2018. That was the window that we felt that the U.S. District Court should have. I'm sorry, that doesn't answer my question, but I guess you're saying that the District Court erred in considering her testimony of events prior to the start of the indictment period. And if that's your argument, give me some supporting authority for that. I apologize, Your Honor. I have to apologize in France. I have a really bad ear infection in my right ear. So I apologize if I don't hear anything or hear more specifically things that are said. So I apologize if I don't answer correctly completely. What I was trying to say, Your Honor, is that the indictment itself did start July 1st. Of course, any conduct prior to that can be discussed by the U.S. in their case-in-chief. We just found that it's very relevant to this argument. Well, now wait, yeah, can be argued by the government. My question was, can we, can the District Court and this Court, consider it in weighing the sufficiency of the evidence? Do you understand that question? Yes, I do understand the question. And the answer is, I believe, yes. Yes. But if you have, if you have contrary authority, I'd like to, I'd like to know about it. No, Your Honor. We were specifically just talking about the indictment period, what they were presenting evidence specifically about what happened during this period of time. Our argument, basically, in terms of the informant was basically just that the confidential informant was the only person to testify to any kind of drug transactions with Mr. Rodriguez. That is why we talked a little bit about the period of time between July 1st and June 20th, 2018. That's why I specifically put it in there to talk about kind of what specifically actions she's talking about. One of the things that we found was interesting when you're looking at the transactions, not as, she testified that maybe there was 20 to 30 transactions over a period of many, many years. She said she'd been a user for 13 years prior to this case. And when she asked, when she was asked by the U.S. Attorney how often that meant she, she bought drugs from Mr. Rodriguez, she said about once a week. And if even the inconsistency of the evidence is there, she said once a week, but also she also said she only bought from him through 13 years, 15 to 20 times over that, I'm sorry, 20 to 30 times over that period of time. So the inconsistency of the evidence of the CI alone was the first part of that piece. The other part is the fact that he does not, there was no other witnesses provided besides the CI and besides the, Andrea Salt, and this, the testimony of the text from the North Dakota Crime Lab, which talks about basically about the substance in themselves. So there wasn't anybody, another, a second person, a second defendant. It's, it's like, when you look at the confidential form, it cannot be seen as someone that is a co-conspirator. So if she can be a co-conspirator, then who was the co-conspirator? And that was our... Didn't, didn't Ms. Burns testify that she was involved in a conspiracy or provide evidence of, of a conspiracy before she became a confidential informant? The only thing she did not testify to anything that happened in July of 2017, which it started from July 17th to that. She did talk about the fact that she, she had bought drugs from Mr. Rodriguez in the past. Yes, that is, that is, she did testify to that. However, she was not sure about the amounts or the years. She basically just gave generalities, including, including any amount of drugs specifically that were given to him or bought from him at that time between that July 1st to August 1st, when she became a confidential informant. So in terms of the, the case itself, yes. And obviously she did testify to that. She did not testify to anybody that anyone else that Rodriguez supposedly was involved with. Do I understand your argument, right? That, that she was a confidential informant during the entire period identified in the indictment? Except for the one month, it started in July 1st, 2017. That first month after that, as of August 1st, she was a confidential informant and he was arrested. So why wouldn't any evidence during that one month alone be sufficient? Because there was no evidence presented by the U.S. Attorney's Office for that month of July of 2017. Everything she testified to as a CI, she said specifically that she, she 20 to 30 times or once a week, depending on what part of the transcript you read. That's the issue is that there was no clear presentation of evidence prior to the indictment. Just a very general- How about her testimony that she helped pay expenses for defendants' monthly trips to Texas to purchase drugs to bring back for distribution? The testimony that was given was not collaborated. In fact, it was not even collaborated in terms of what was testified to during the conspiracy itself. There was testimony about being drugged, money being left there, but because the task force did not watch to see who exactly was, if the money was even picked up, it was dropped off. They gave her the money. That's all they know. They didn't watch her drop it off. They didn't watch to see if anybody picked it up. They just left it. So we don't know if anybody ever picked it up at all. Sergeant Andreas Alt testified that they didn't have the ability to watch. So they just left it. So we don't even know if someone came back, someone who one of our associates went back and got it. We have no idea what happened even to the money. My client, Mr. Rodriguez, was known to be already out of the state because he was being tracked on GPS. So we know he was not there. So that was the issue we had is, well, we don't even know if anybody got it. Or if she went back and got it. I mean, she does have a criminal history. She does have, you know, drug problems. It's like there's no evidence showing one way or another that someone didn't come take the thousand dollars that the CI was given by the task force. So we didn't have any... Sounds like a credibility argument, counsel. It could be a credibility argument. Well, not to us. I mean, our cases are legion. The credibility is for the fact finder. We're also... But also what we're looking at, the state talked a lot about... I'm sorry, the US government talked a lot about other co-conspirators like a person's unknown in Texas. However, there's no evidence of where the drugs that were found in Mr. Rodriguez's vehicle when he came back from to North Dakota. There was no evidence of where those drugs were even found. There was no drugs that... There was no evidence of where the drugs were bought. There's no evidence of anyone who bought them. There was no evidence of anything. Not even they're born in Texas. So to make persons in Texas a co-conspirators, it's just not credible. How can you say, well, somebody down there bought drugs? Our argument basically was that there was no... You could not prove where those drugs came from. And although they don't need to name all their co-conspirators, they do need to aim two people, Your Honor. And there is not two... Two people were not given. There has to be a concert of actions between two marked persons for a common purpose. The mere agreement just to buy drugs from someone does not support a conspiracy. It's drug transactions. And the United States v. Boykin is very clear on that. I think it's just... It has to be a concert of action between Mr. Rodriguez and the second person, not a control that wasn't a conformant. I understand that the Eighth Circuit doesn't have to be an actual agreement, but there has to be some tacit understanding between the parties. There just isn't that in the transcript anywhere. If you look through the whole testimony... And there's not even a virtual roadmap of establishing the existence of a conspiracy because there just wasn't any available. Our concern, Your Honor, is that Mr. Rodriguez is being convicted of a conspiracy when one did not exist. There's no evidence of communications between Mr. Rodriguez and anybody. They grabbed his cell phones when he was arrested on November 9, 2017. There's no evidence on the phones. There's no evidence of any additional trans persons or conspirators traveling with him. There's no direct or indirect testimony of communications between Rodriguez and anyone, including the CI. There's no drug-related reference from his phone. There's no evidence that it was deleted. Also, they always look at... In terms of your cases in the past, your case law says you'll get multiple sales and retail quantities. The drugs that were taken from his vehicle obviously just got to the state. There was no evidence that those were for resale. There was no evidence of anything. They were found inside meat bundles. Some were in the meat bundles. Some were found inside of a cooler liner. Well, doesn't the quantity alone suggest they were for resale? Your Honor, I understand that that doesn't look like that because obviously there was quantities in there, but my client has never said that that was something that he had done. He's always been steadfast saying that that was something that was... That they were in the meat bundle when he bought it. He did not put them in there. He bought them directly from the meat market. Conspiracy can be as strong as you want it to be. There was an ongoing relationship for the purpose of buying and selling drugs, but there wasn't any ongoing relation from anything. And there's no evidence at trial presented of the origin of the controlled substances or the agreement in terms of resale, much less the identity of any persons involved. Also, Your Honor, there was also a reference to a third party that was maybe picking up drugs. The unknown sister that Mr. Rodriguez does not have. He does not have a sister. So in terms of that, we're just asking the court to find what they did not put down. There's no doubt that this conspiracy existed in terms of Mr. Rodriguez because there was only Mr. Rodriguez. There wasn't anybody else that they were indicting. There was nobody else in the indictment. There was no one else anywhere within that case. Ms. Shuman, do you wish to retain any time for rebuttal? Uh, Your Honor, no, that's fine. Well, you've got a minute and 42 seconds left if you pause now, but you can continue if you like. No, Your Honor, I can stay for rebuttal. Thank you. All right. Ms. Healy. Thank you, Your Honors. Can you hear me? Yes. Thank you. Good morning. May it please the court and Ms. Shuman. My name is Megan Healy and I represent the United States in this matter. The United States respectfully asks this court to affirm the judgment of the district court. Viewing the evidence in the light most favorable to the government, more than sufficient evidence supported the defendant's conspiracy conviction. A co-conspirator testified about her involvement in the conspiracy before she became a confidential informant. Her testimony showed the defendant sold her distribution quantities of methamphetamine on a weekly basis for months leading up to when she became a C.I. after she herself was busted. She in turn distributed these quantities to others and used them. Ms. Burns also testified about the defendant's periodic resupply trips to Texas that she helped to finance and about witnessing the defendant. Counsel, counsel, what did the government argue to the jury? Who were the conspirators after Ms. Burns withdrew and became an informant? Your Honor, in closing, the arguments were that Ms. Burns was a conspirator before August 1st, 2017 and that there was an unknown conspirator or conspirators in Texas who supplied the defendant on a regular basis and particularly in November 2017 with the large quantities with which he was found. There was also... What was the proof of those unknown persons in Mexico? Ms. Burns testified in her conduct before August 1st, 2017 about the defendant taking periodic resupply trips to Texas and he would return with methamphetamine. This suggests there's some unknown individual who is his reliable source in Texas and then the law enforcement tracked him going to Texas in November 2017 and returning and with large quantities of actual methamphetamine and cocaine that were expertly hidden in a cooler and in frozen meat which those facts corroborated what Ms. Burns said about her pre-confidential informant involvement in the conspiracy. Other evidence of the conspiracy this court has touched on that Ms. Burns testified to an ongoing methamphetamine distribution relationship with the defendant before August 1st, 2017. She estimated that she received methamphetamines from him at least once a week in the months leading up to when she herself was busted in August 2017. Indeed, he was her primary source of methamphetamine. During this time, she estimated 20 to 30 such deals involving one to two eight balls. There was testimony that this was distribution quantity of methamphetamine. Ms. Burns testified that she did use some for herself but she also sold to others to finance her own addiction. Did any of that testimony involve things that occurred in July which I think is the beginning of the indictment period? Your Honor, I don't, Ms. Burns testified to her involvement leading up to when she was busted in 2017. I don't believe there was a specific question asking, did this happen in July? It was her conduct and her regular conduct that she talked about once a week until she was busted. So I don't think there was a specific question regarding, was this in July? I will note that the jury was instructed in preliminary instruction two as to the meaning of honor about and that it's sufficient that the case established beyond a reasonable doubt that the offense was committed on a date reasonably near the alleged dates in the indictment. This can go to some period before July 1st, 2017 and the instruction is right in line with this court's case law on what honor about means. But when counsel was asking these questions about what she knew of the conspiracy, it was up to her involvement until she got busted which was of course the date she ceased being a co-conspirator and began working with the United States. She also testified about observing other individuals purchasing methamphetamine from the defendant. Ms. Burns confirmed that the methamphetamine and this perhaps goes to the question about July, she confirmed that the methamphetamine she herself was caught selling that day to a different confidential informant did come from the defendant. That is on page 156 of the trial transcript. And then of course the huge quantities of methamphetamine that the defendant and cocaine that the defendant was caught with in November, 2017 are most certainly distribution quantities and the jury was instructed and I believe it was final instruction 15 that such large quantities of drugs can be proof of an intent to distribute. So these facts reference an agreement among Mr. Rodriguez, Ms. Burns pre-August 1st, 2017, an unknown individual or individuals in Texas from whom the defendant routinely sourced his methamphetamine and the facts show the defendant at the heart of a conspiracy in Grafton, North Dakota. This is not the kind of case where the facts support a buyer-seller instruction or buyer-seller defense and indeed this court would be reviewing that claim for plain error as it was not the defense offered at trial and there was no buyer-seller instruction requested. The evidence showed repeated deals over a period of time in distribution quantities and Ms. Burns assisting the defendant in furtherance of the conspiracy by assisting with funding for his trips to Texas. I would like to briefly touch on the transcript issue, the second issue, although counsel did not raise it in her argument. In this case, it's the United States' position that an error did not occur, but if one did, the defense counsel invited the error. The defense counsel, the record makes clear that the defense counsel received the transcript in question, had a conversation with the United States reaching an agreement related to Exhibit 5 and the related transcript, affirmed her assent to that agreement in writing and at the pretrial conference again confirmed that agreement by informing the court she wanted the transcript limited to the actual buy itself, not the entirety of the recording, setting up the controlled buy and debriefing at the end of the controlled buy. Thereafter, defense counsel reversed her position and the district court gave defense counsel just what she requested related to the transcript at issue. The defense counsel did much more here than inadvertently fail to raise an objection in the district court. She prompted the district court to embark on a specific course of action that she specifically approved. And on that record, any error related to the transcript was invited. Specifically, the things that the defense counsel requested that the district court then accommodated. Defense counsel did not want to see the jury, the jury to see the transcript during future playings of Exhibit 5 was played two more times at trial after the initial viewing that was done. The defense counsel did not want the jury to get a copy of the transcript. The United States had not offered it into evidence, but ensured that the jury did not see the transcript again. Defense counsel asked for time to determine if the transcript was accurate. That was given to defense counsel. There are multiple opportunities as this issue was discussed many times during trial and final instructions were reviewed many times during trial to request some kind of an instruction related to transcripts, but defense counsel did not do that. When the district court ruled that the United States could use the transcript in closing, there was no objection to that ruling. Instead, defense counsel asked for extra time to prepare for closing argument and received an extra night to prepare. And defense counsel wanted the original Exhibit 5, which had simultaneous transcript playing along with the audio, removed from the record and replaced with a new Exhibit 5 that had no transcript with it. That was done. The district court accommodated every request of defense counsel related to this issue. And for that reason, there's no reversible error under either invited error or under a plain error review if this court does elect to review the issue. Counsel, in your view, what is the factually closest case you cite for a waiver or invited error? I think the case that's factually closest, the case that we cited predominantly in our brief on the invited error issue is the Campbell case. And that, of course, involved a guidelines issue, which is not what we're necessarily dealing with in this case. Here we had a clear objection at trial. Why doesn't that preserve the ability to argue that what happened thereafter did not eliminate prejudice? Well, Your Honor, there was an agreement and there was a late objection at trial. There was not an objection when the exhibit was offered. When the jury left the room and the parties were discussing this issue because it was poor quality and the trial judge hadn't even seen there was a transcript because it was so small and four of the 12 jurors also couldn't see that there was a transcript. The parties discussed this issue. There was no objection. The district court specifically asked Ms. Schuman, is there anything else? And Ms. Schuman said, no, nothing else. Later, the parties come back and then Ms. Schuman represents that she had never seen a transcript, had no idea the transcript said. Well, the record is clear that the transcript was provided pre-trial, referenced in the United States agreements, affirmed by defense counsel and specifically referenced by defense counsel at the pre-trial conference that she wanted the transcript limited. And then thereafter, despite this very late objection, the district court then did everything that the defense counsel asked related to this issue. This is simply not reversible error under any standard of review and particularly under a plain error review. I didn't see a case cited where to make it in defendant's brief outlining where this would be, where the fact what happened here would satisfy being a plain error. But even so there's no effect on substantial rights here where there was respecting with respect to the count of conviction at issue, count six, the fifth of the control buys, that there's a large amount of evidence supporting that conviction and the other distribution convictions and of course the possession conviction. And nor would the facts of this case seriously affect the fairness, integrity and public opinion of judicial proceedings. This is a case specific and fact intensive inquiry where here the facts are that the transcript was disclosed, discussed and agreement memorialized and affirmed both in writing and at the pre-trial conference. There's a single viewing of the transcript of lettering so small, only eight jurors could see it. And the trial judge himself, despite having his own screen missed it until partway through. Moreover, defense counsel identified at trial and on appeal only a single allegedly material error and argued that error to the jury, urging the jury to go listen to the audio for themselves. The jury did not receive a copy of this transcript and everything as I've already outlined that defense counsel asked the court to do with regard to the transcript, the court did. The facts here, even if there was a plain error that affected the substantial rights, which we do not concede any of those points, the facts here do not warrant correcting a forfeited error. I also note that the remedies sought for that error is overbroad. Defense counsel has not linked that error to the conspiracy counts and has not asked for a new trial on the conspiracy count. Counts two, three, four, and five are the other individual controlled buys unrelated to the transcript. And count six, of course, is that buy. And the possession count, count seven, defense counsel has not tied the defendant's possession of very large quantities of methamphetamine to an allegedly incorrect transcript. For these reasons, the United States urges the court to affirm the judgment of the district court on all grounds. And if there's nothing further, I will yield the rest of my time. Thank you very much. Thank you, Ms. Heumann. Ms. Heumann, you have... Yes, your honor. In terms of the transcript that Mr. Heumann was talking about, it's certainly not true. When I talked to the U.S. attorney the day before the trial, which they had had this audio video for over a year that they had not transcribed it. I got the transcription when I was... After I already left Grand Forks to drive to Fargo, which is about 70 miles. I got to Fargo at a hotel and there was an email saying, when I talked to the U.S. attorney on the phone, we talked specifically about limiting not the transcript, but the actual audio recording. Because it was about 20 minutes long from when they drove to the facility for the CI and then the CI went back. So it was like that, just the actual file that we were talking about specifically. I had not seen the audio transcript until I got down to Fargo, but I didn't see the actual audio that had been running on the bottom. I saw a transcript that they sent me that said, oh yeah, this is what we think it is. However, that was not accurate. And that's my main problem. It wasn't that... If it would have been an accurate transcription, it would have been fine. But to say that because eight of the 12 jurors saw it and they wasn't affected by it, that's just not logistical. I mean, basically you can't barely understand it. Judge said many times, he just couldn't understand what it said. He was trying to figure out what it said and that's where it all started. It was when I took it home because there was 20 consistent differences wrong. That is why we're asking for this to be overturned. Thank you. Thank you, Ms. Schumann. That's all. Counsel Healy, the court appreciates the argument you provided to us this morning and everything which you have submitted and we will take the case under advisement. That's my needs.